UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RENAE SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:11-CV-1495 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 11, 2008, plaintiff Renae Smith filed an application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 405(g), with an alleged onset date of September 8, 2007. (Tr. 99-101). After plaintiff's application was denied on initial consideration on July 22, 2008, (Tr. 57-63), she requested a hearing from an Administrative Law Judge (ALJ) on August 9, 2008. (Tr. 64-65). Plaintiff appeared and testified at the hearing on October 30, 2009. (Tr. 12-34). The ALJ issued an unfavorable opinion on December 18, 2009. (Tr. 38-54). Plaintiff filed a request for review on January 14, 2010. (Tr. 11). The Appeals Council denied plaintiff's request for review on July 26, 2011. (Tr. 1-6). Accordingly, the ALJ's opinion stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Administrative Hearing

At the time of the hearing on October 30, 2009 (Tr. 14-34), plaintiff was 55 years old. She was enrolled in an on-line college course and was nearing completion of her associate's degree. She lived with her husband and brother-in-law. Plaintiff testified that she was last employed at Bank of America in 2007 as a loan closer.

Plaintiff testified that she had hepatitis C for which she was prescribed Infergen[1] and RibaPak[2]. She testified that the medication caused her to have memory loss, impaired motor skills, charlie horses[3], cramps, and inability to sleep. Plaintiff testified that she had stopped taking the medicine in September 2009, but she continued to experience side effects. According to plaintiff, the doctor who prescribed the medications, Damon Clines, M.D., told her that the side effects would be permanent. Plaintiff stated that she could not retain anything, that sometimes she did not remember what she had done two minutes earlier.

Plaintiff also claimed to have charlie horses in her legs and arms and hands that occurred at various times of the day and night, with each episode lasting from 5 minutes to 45 minutes. When the charlie horses occur, she has to "walk until I get them walked out." (Tr. 22). She reported that she slept an average of 4 or 5 hours per

---

[1] Infergen is used to treating long-term hepatitis C virus infection in patients 18 years of age or older. It may also be used for other conditions as determined by your doctor. http://www.drugs.com/cdi/infergen.html#148ktyIH1YMgIAZd.99.

[2] RibaPak is the brand name for ribavirin, an antiviral medication. Ribavirin must be used together with an interferon alfa product (such as Pegasys, PegIntron, Sylatron, or Intron A) to treat chronic hepatitis C. http://www.drugs.com/mtm/ribapak.html#6Uu4rTHs0yvb2Hzv.99.

Charlie horse is pain and tenderness in the fibromuscular tissue of the thighs usually due to muscle strain or tear. Characterized by sudden onset and aggravation upon movement. Taber's Med. Dict. 267 (14th ed. 1983).

night. However, if there are no charlie horses or if she takes her prescribed sleep medication, she "can get a normal eight hours" of sleep. (Tr. 23).

Plaintiff also claimed to suffer from depression resulting from not being able "to do the things I really enjoy." (Tr. 23). She testified that she had crying spells once every day or two. She also testified to having suicidal or homicidal ideas once every three months.

Plaintiff testified that she bathed twice a week; she did this only when her husband was present because she feared getting a charlie horse and being unable to get out of the tub. Her appetite had decreased since she last worked and she ate one or two meals a day; she testified that she had lost 15 pounds due to stress and that she weighed 115 pounds at the time of the hearing. Plaintiff testified that leg cramps and a lack of strength prevented her from going out for entertainment. and when she did, her husband drove her. Plaintiff washed dishes and laundry and cooked meals on Sunday. She was able to drive a distance of a half a block and she could do 5-10 minutes of grocery shopping. Sunday. Plaintiff reported that cramps impaired her ability to do vacuuming, do her hair, and to lift and carry items heavier than 5 pounds. Plaintiff stated that she was not able to stand for longer than 5 to 10 minutes or walk farther than half a block because she would become tired and have to catch her breath. Because of her weight loss, her buttocks hurt if she sat for "too long." Plaintiff testified that she continued to smoke and "take a drink." (Tr. 30).

Vincent Stock, a vocational expert, testified about the employment opportunities for an individual of plaintiff's age and with her education, training and work experience; who has no exertional limitations; who should avoid concentrated exposure to pulmonary irritants; and who is limited to unskilled work which requires no more than

3

occasional contact with the public or coworkers. (Tr. 30-34). Mr. Stock opined that such an individual could not return to plaintiff's past work. However, there were jobs available in the national economy that the individual could perform, such as assembly line fabricator, silicon wafer breaker, cashier, lamp-shade assembler, and factory-helper. Stock further testified that in light of limitations described by Dr. Clines, plaintiff would be absent from work too frequently to be capable of competitive employment.

### B. Other Evidences

On March 25, 2008, plaintiff completed a Missouri Supplemental Questionnaire which asked about her ability to perform certain tasks since she stopped working. (Tr. 165). Plaintiff responded that she was able to wash dishes, make the bed, change sheets, iron, vacuum and sweep. She also responded that sometimes she was able to do laundry, do gardening, and go to the bank or post office. Plaintiff wrote that seh went shopping once a month, that she was able to drive familiar routes, and that she could watch a two-hour movie. (Tr. 165-167). Plaintiff reported that she had difficulty sleeping and could stay asleep only for 2 hours. (Tr. 166).

### III. Medical Evidence

### A. Hepatitis C

Plaintiff was admitted to St. Louis University Hospital on April 12, 2007 due to complaints of a sudden onset of abdominal pain, nausea and vomiting. (Tr. 209-211). She complained of pain moving from the right upper quadrant to periumbilical region that was colicky in nature. The diagnosis by Charles H. Andrus, M.D., was cholecystitis[4]

---

[4]Cholecystitis is inflammation of the gallbladder. Taber's Med. Dict. 279 (14th ed. 1983).

and cirrhosis[5]. (Tr. 211). Plaintiff responded very well to intravenous antibiotics and intravenous fluids. (Tr. 210). Plaintiff was told that she could return to work on April 18, 2007. (Tr. 211). Dr. Andrus noted that plaintiff would need a cholecystectomy[6] at some point. (Tr. 210). Plaintiff was discharged on April 15, 2007 with instructions to continue taking Prevacid[7], multivitamin and thiamine[8]. She was given prescriptions for Percocet[9], Colace[10], Levaquin[11] and Flagyl[12].

From April 2007 to May 2007, Levi Kirkland, M.D., performed several examinations of plaintiff's liver function at St. Mary's Health Center. A gallbladder

---

[5]Cirrhosis is a chronic disease of the liver characterized by formation of dense perilobular connective tissue, degenerative changes in parenchymal cells, alteration in structure of the cords of liver lobules, fatty and cellular infiltration, and sometimes development of areas of regeneration. In addition to the clinical signs and symptoms inherent in the cause of the cirrhosis, those due to cirrhosis are the result of loss of functioning liver cells and increased resistance to flow of blood through the liver (portal hypertension). Taber's Med. Dict. 295 (14th ed. 1983).

[6]Cholecystectomy is excision of a gallbladder. Taber's Med. Dict. 279 (14th ed. 1983).

[7]Prevacid belongs to a group of drugs called proton pump inhibitors. Prevacid decreases the amount of acid produced in the stomach. http://www.drugs.com/prevacid.html.

[8]Thiamine is a white crystalline compound occurring naturally and produced synthetically. It is widely distributed in various animal and plant foods. Taber's Med. Dict. 1449 (14th ed. 1983).

[9]Percocet is used to relieve moderate to severe pain. http://www.drugs.com/percocet.html.

[10]Colace (docusate) is a stool softener. It makes bowel movements softer and easier to pass. http://www.drugs.com/mtm/colace.html.

[11]Levaquin is used to treat bacterial infections of the skin, sinuses, kidneys, bladder, or prostate. It is also used to treat bacterial infections that cause bronchitis or pneumonia, and to treat people who have been exposed to anthrax or plague. http://www.drugs.com/levaquin.html.

[12]Flagyl is an antibiotic. It is used to treat bacterial infections of the vagina, stomach, skin, joints, and respiratory tract. http://www.drugs.com/flagyl.html.

sonogram showed plaintiff had gallstones. (Tr. 339). The result of a hepatitis C abnormal screen result was reactive. (Tr. 272). Another MRI abdomen examination showed no suspicious liver masses, simple liver cysts and left adrenal adenoma[13]. (Tr. 340).

Plaintiff was admitted to St. Mary's Health Center on June 4, 2007. (Tr. 290). Dr. Kirkland performed a laparoscopic cholecystectomy and a needle biopsy of plaintiff's liver. (Tr. 290). The test results showed cholelithiasis[14] with mild chronic cholecystitis and fibrotic subcapsular liver tissue with mild to moderate periportal chronic inflammation. (Tr. 293). Dr. Kirkland diagnosed plaintiff with cholelithiasis, cirrhosis of the liver and hepatitis C. (Tr. 290).

In May 2007, plaintiff began seeing Dr. Clines who made a diagnosis of hepatitis C. (Tr. 320). From May 2007 to July 2009 plaintiff repeatedly complained to Dr. Clines about having fatigue. (Tr. 320, 318, 314, 313, 312, 311, 409, 410, 418, 417). Dr. Clines first prescribed peg interferon in October 2007. (Tr. 314). In March 2008, after noticing that plaintiff's hepatitis C virus (HCV) was not responsive to peg interferon, Dr. Clines changed plaintiff's medication to infergen. (Tr. 310, 311). After the change, plaintiff reported that she felt well. (Tr. 420, 418). In April 2009, plaintiff reported that she had been out of medication since the end of January. (Tr. 419). From September to October 2007 plaintiff complained about body aches and bone pain. In response, Dr. Clines prescribed Vicodin. (Tr. 315, 314). From January to November 2008 plaintiff made complaints of depression. In response Dr. Clines prescribed Paxil.

---

[13] A neoplasm of glandular epithelium. Taber's Med. Dict. 1449 (14th ed. 1983).

[14] Cholelithiasis are gallstones. See Stedman's Med. Dict. 339 (27th ed. 2000).

6

(Tr. 313, 312, 311, 409, 410). In November 2008 plaintiff complained about muscle cramps. (Tr. 410). In March and July 2009 plaintiff reported weight loss. (Tr. 418, 417).

From September 2007 to March 2008 plaintiff underwent four tests, all of which detected the hepatitis C virus. (Tr. 252-57). From April 2008 to July 2009 plaintiff underwent six hemoglobin and hematocrit[15] studies. In four of the studies (October 2008, Feburary 2009, April 2009, July 2009), plaintiff's results were within range. (Tr. 439, 431, 428, 426). The April 2008 study showed that plaintiff's hemoglobin was out of range but her hematocrit was in range. (Tr. 441). The results of the November 2008 study showed that plaintiff's hemoglobin and hematocrit were out of range. (Tr. 405).

Plaintiff was seen by consultative physician Elbert Cason, M.D., on June 20, 2008. (Tr. 345-348). Her chief complaints at that time were hepatitis, headaches, and shortness of breath. Plaintiff reported that she had once been a heavy drinker but that she had stopped drinking alcohol after being diagnosed with hepatitis C. Plaintiff's medications at the time were ibuprofen, Effron, and Paxil. Plaintiff's physical examination was normal. Dr. Cason noted the earlier diagnosis of hepatitis C based on the 2007 liver biopsy, but found that plaintiff had no evidence of any active hepatitis at the time of his examination. He also noted that plaintiff's headaches were treated with ibuprofen and that her shortness of breath was caused by smoking cigarettes.

In May 2009 Dr. Clines completed a Hepatitis C Residual Capacity Questionnaire.

---

[15]Hemoglobin is the protein contained in red blood cells that is responsible for delivery of oxygen to the tissues. The hematocrit measures the volume of red blood cells compared to the total blood volume. When the patient does have symptoms from an abnormality in the hemoglobin level, the symptoms are often a nonspecific weakness or fatigue. http://www.nvbi.nim.nih.gov/books/NBK259.

(Tr. 411-46). He noted that plaintiff suffered from chronic fatigue, muscle and joint aches, difficulty concentrating, weakness, loss of appetite, sleep disturbance, muscle wasting, and weight loss. Anxiety and depression were noted as emotional factors that contributed to the severity of plaintiff's symptoms. Dr. Clines identified a viral load study and a hemoglobin/hematocrit study as the objective tests which correlated with plaintiff's fatigue. Dr. Clines noted that the side effects of plaintiff's medication were irritability and fatigue.

Dr. Clines reported that plaintiff could not work for more than five hours a week. She could not stand or sit longer than five minutes at one time or longer than two hours in an 8-hour working day. According to Dr. Clines, plaintiff would have to take more than 10 unscheduled breaks during an average 8-hour workday, and she would have to rest for more than two hours before returning to work. Plaintiff could not lift items weighing more than 10 pounds and could never twist, stoop, crouch, climb ladders or climb stairs. Dr. Clines opined that plaintiff's impairments or her treatment would likely cause her to be absent from work for more than four days per month. Dr. Clines reported that his description of the symptoms and limitations in the questionnaire applied as early as May 25, 2007.

Plaintiff was seen by Raymond Leung, M.D., in July 2009. (Tr. 445-448). The physical examination suggested ascites[16] as the cause of plaintiff's decreased energy and abdominal pain. Plaintiff reported headaches 1-2 times per week for which she took aspirin. Dr. Leung observed no severe physical limitations: plaintiff was able to walk 50 feet unassisted, hop, and squat. All plaintiff's joints showed full range of motion. There was no muscle atrophy and no spasms. Plaintiff could oppose the

---

[16]Ascites is the accumulation of serous fluid in the peritoneal cavity. Taber's Med. Dict. 129 (14th ed. 1983).

8

thumb to each finger in both hands. Plaintiff had no difficulty getting on and off the exam table.

## B. Chronic Obstructive Pulmonary Disease

Treatment records from Lavert Morrow, M.D., in November 2007 indicate that plaintiff had increased shortness of breath and chronic obstructive pulmonary disease (COPD). (Tr. 238, 237). Dr. Morrow recommended that plaintiff stop drinking. (Tr. 243, 247, 249-50).

Ahmed Nadeem, M.D., performed a body plethysmography[17] in January 2008. Dr. Nadeem found no evidence of airway obstruction or airway restriction, but noted that plaintiff had severely reduced diffusing capacity. Diffusing capacity could be reduced due to various factors including loss of surface alveolar[18] epithelium[19], pulmonary fibrosis[20] or interstitial[21] lung disease. (Tr. 259).

In July 2009, Dr. Leung noted that plaintiff had decreased and slightly coarse breath sounds. Although a previous pulmonary function test showed restriction, Dr. Leung found that plaintiff was in no respiratory distress.

## C. Depressive Disorder and Mental Capacity

---

[17]Plethysmography is an examination to find variations in size of a part due to variations in amount of blood passing through or contained in the part. Taber's Med. Dict. 1115 (14th ed. 1983).

[18]Alveolar is air cell of the lungs. Taber's Med. Dict. 59 (14th ed. 1983).

[19]Epithelium is the layer of cells forming the epidermis of the skin and the surface layer of mucous and serous membranes. Taber's Med. Dict. 493 (14th ed. 1983).

[20]Fibrosis is formation of scar tissue in connective tissue framework of lungs following inflammation or pneumonia and in pulmonary tuberculosis. Taber's Med. Dict. 538 (14th ed. 1983).

[21]Interstitial means pertaining to interstices or spaces within an organ or tissue. Taber's Med. Dict. 740 (14th ed. 1983).

Plaintiff underwent a psychological evaluation by licensed psychologist L. Lynn Mades, Ph.D., on June 20, 2008. (Tr. 354-58). Dr. Mades' diagnoses were depressive disorder-not otherwise specified; alcohol dependence in early remission; polysubstance dependence in sustained full remission; personality disorder-not otherwise specified; and mild to moderate psychosocial and environmental problems, health problems, and interpersonal problems. Dr. Mades noted that plaintiff described a few symptoms of depression. He believed that her substance abuse was a likely contributor to her mood problems. Although plaintiff denied substance use "for the past several months . . . it [was] not clear if she is a reliable informant regarding her substance use." (Tr. 358). Dr. Morrow found no evidence of thought disturbance; he found plaintiff's history and presentation to be evidence of only minimal mood impairment. Plaintiff reported spending her time doing jigsaw puzzles.

A psychiatric review technique form was completed by Kyle DeVore, Ph.D, on July 21, 2008. (Tr. 359-70). Dr. DeVore believed that a mental residual functional capacity (RFC) was necessary, in light of plaintiff's affective disorders, personality disorders and substance addiction disorders. With respect to plaintiff's functional limitations, Dr. DeVore found that plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. Dr. DeVore concluded that plaintiff appeared to retain the capacity of following at least one- or two-step instructions and performing at least simple work-related tasks, and that social restrictions would likely be helpful for plaintiff due to her reported intolerance for others.

Dr. DeVore also completed a mental RFC assessment in July 2008. (Tr. 371-73). He rated plaintiff as being moderately limited in the ability to understand and

remember detailed instructions, in the ability to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get alone with coworkers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting, and to set realistic goals or make realistic plans independently of others. Dr. DeVore concluded that plaintiff remained capable of performing at least simple work related tasks, and that social restriction would help with performance due to her intolerance for others.

John Rabun, M.D., evaluated plaintiff in July 27, 2009. (Tr. 451-453). Dr. Rabun found that plaintiff had the capacity to focus, concentrate and remember instructions. He also found that she had the ability to interact appropriately in a social setting and to adapt to changes in a work environment, if she chose to do so. Dr. Rabun found plaintiff to be capable of managing her own benefits and funds.

### IV. The ALJ's Decision

In the decision issued on December 19, 2009, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2. Plaintiff has not engaged in substantial gainful activity since September 8, 2007, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

3. Plaintiff has the following "severe" impairments: chronic obstructive pulmonary disease, hepatitis C (by history), depression and a personality disorder (20 C.F.R. § 404.1520(c)).

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525 and 404.1526).

11

5. Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she should avoid concentrated exposure to pulmonary irritants and she can perform unskilled work that requires no more than occasional contact with the general public and co-workers.

6. Plaintiff is unable to perform her past relevant work (20 C.F.R. § 404.1565).

7. Plaintiff was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the medical-vocational rules as a framework supports a finding that plaintiff is not disabled, whether or not plaintiff has transferable job skills (See SSR 82-41 and 20 C.F.R. § 404, Subpart P, Appendix 2).

10. Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from September 8, 2007 through the date of this decision (20 C.F.R. Part 404.1520(g)).

(Tr. 43-50).

## V. Discussion

To be eligible for disability insurance benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. § 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."

Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

### B. **Plaintiff's Allegations of Error**

Plaintiff contends that the ALJ (1) failed to point to "some" medical evidence to support his findings with regard to plaintiff's RFC; and (2) failed to pose a proper hypothetical question to the vocational expert and therefore improperly relied on the expert's response in concluding that plaintiff can perform other jobs.

#### 1. **The ALJ's RFC Determination**

A claimant's RFC is what she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of her limitations. Id. The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). In the instant case, the ALJ found that plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she should avoid concentrated exposure to pulmonary irritants and she can perform unskilled work that requires no more than occasional contact with the general public and co-workers. (Tr. 45).

Plaintiff first argues that the ALJ failed to give proper weight to the RFC assessment of her treating physician, Dr. Clines. Dr. Clines opined that plaintiff could not stand or sit for longer than five minutes at one time or longer than two hours in an 8-hour working day, and that her fatigue would prevent her from working more than five hours per week and would cause her to be absent more than four days per month. The ALJ found those limitations to be inconsistent with the record.

In evaluating medical evidence, it is the ALJ's function to resolve conflicts among "the various treating and examining physicians." Bently v. Shalala, 52 F.3d 784 (8th Cir. 1995) (internal citation omitted). Generally, the opinion of a treating physician is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2). Further, a treating physician's opinion is generally given deference over those of consulting physicians. Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). However, "[a]n ALJ may reject a treating physician's opinion if it is inconsistent with the record as a whole." McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011) (citing Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008)).

There are several inconsistencies between Dr. Clines' opinion and the record in this case. Plaintiff's viral load study and hemoglobin/hematocrit study have been normal since November 2008 and do not support Dr. Clines' conclusion that plaintiff suffered from severe fatigue as of May 2009. Plaintiff's self-reported ability to perform household chores (laundry, wash dishes, make a bed, iron, vacuum, sweep, garden, drive, grocery shop, and watch television) and jigsaw puzzles makes Dr. Clines' opinion that plaintiff could not stand or sit for longer than five minutes or concentrate

15

unconvincing. Dr. Leung found plaintiff able to walk 50 feet unassisted, hop, squat, to get on and off the exam table without difficulties, and to have full range of motion in all her joints. These findings are inconsistent with Dr. Clines' report that plaintiff could never twist, stoop, crouch, climb ladders or stairs. Although Dr. Clines found that plaintiff had difficulty concentrating, plaintiff was able to do jigsaw puzzles and watch a two-hour movie. Finally, "[a]n ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes." Martise v. Astrue, 641 F.3d 909 (2011) (quotation omitted). In the hepatitis RFC questionnaire, Dr. Clines reported that plaintiff had muscle and joint aches, muscle wasting and weight loss. However, none of these conditions was ever mentioned in his treatment notes covering a two-year period.

Furthermore, Dr. Clines' assessment is inconsistent with plaintiff's testimony. Plaintiff testified that she was advised by Dr. Clines that the side effects of her hepatitis C medication would be permanent. However, this is neither reflected in Dr. Clines' treatment notes nor in his RFC assessment form. Plaintiff also testified that she had cramps and spasms daily, with each occurrence lasting from 5 minutes to 45 minutes. These symptoms are not reflected in Dr. Clines' RFC questionnaire.

Plaintiff's noncompliance with treatment also renders Dr. Clines' RFC assessment less controlling. "[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (citing Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008)). Plaintiff was out of medication for more than two months in early

2009.  She was told to stop drinking alcohol but she admitted the hearing that she had not done so.

For the reasons discussed above, the Court finds that the ALJ did not err in determining the weight to be given to Dr. Clines' opinion.

Plaintiff argues that the ALJ failed to address the factors required in evaluating medical opinion evidence.  If a treating source's opinion is not given controlling weight, the commissioner considers the examining relationship, the treatment relationship, the supportability, the consistency of the medical opinion, the specialization of the medical source, and other factors brought to the commissioner's attention bearing upon the weight medical opinion evidence should be accorded.  20 C.F.R. § 404.1527(c)(1)-(6).  In this case, the ALJ considered the fact that Dr. Clines examined plaintiff and had treated plaintiff since May 2007.  The ALJ specifically noted that the objective findings did not lend support to Dr. Clines' opinion and that the limitations described by Dr. Clines were inconsistent with the record.  (Tr. 49).  The ALJ also acknowledged that Dr. Clines was recognized by plaintiff as a specialist in liver diseases.  (Tr. 21).  Therefore substantial evidence supports that the ALJ considered all the factors the regulations require before assigning weight to treating source's opinion.

Plaintiff next argues that the ALJ was required to re-contact Dr. Clines for clarification or for additional information.  While the regulations provide that an ALJ should re-contact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled, 20 C.F.R. § 404.1512(e), the requirement is not universal.  "The regulations do not require an ALJ to re-contact a treating physician whose opinion was inherently contradictory or unreliable.  This is especially true when the ALJ is able to determine from the record

17

whether the applicant is disabled." Hacker v. Barnhart, 459 F.3d 934 (8th Cir. 2006). Because substantial evidence supports the ALJ's finding that Dr. Clines' opinion was at odds with the other evidence in the record, the ALJ was under no obligation to re-contact the treating physician.

Plaintiff also argues that the ALJ articulated no medical evidence to support his RFC determination. The RFC determination must be supported by some "medical evidence that addresses claimant's ability to function in the workplace.' " Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir. 2000)). An ALJ may not draw upon his own inferences from medical reports. Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975). Plaintiff's argument is without merit. Neither of plaintiff's consultative examinations revealed significant abnormalities. (Tr. 347, 447). The Court finds substantial evidence that the ALJ relied on at least some medical evidence.

Plaintiff also argues that the ALJ failed to consider her pulmonary problems in combination with her significant fatigue. Although the ALJ is required to consider all of a claimant's medically determinable impairments (20 C.F.R. § 404.1545(a)(2)), "failure to follow a prescribed course of remedial treatment without good reason is ground for denying an application for benefits." Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quotation omitted). Although Dr. Cason told plaintiff that smoking was the cause of her shortness of breath, plaintiff continued to smoke. See 20 C.F.R. § 416.930(b). The ALJ had substantial evidence to conclude that plaintiff's pulmonary problems required her tol avoid concentrated exposure to pulmonary irritants, but that she otherwise retained RFC to perform work at all exertional levels.

The Court finds the ALJ's RFC determination is supported by substantial evidence. In reaching this determination the ALJ considered the medical records, the opinions of the consultative physicians, plaintiff's eligibility for private disability benefits, and plaintiff's testimony regarding her daily activities. See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (There is substantial evidence in the record to support the ALJ's decision when "the ALJ did not rely solely on the opinion of the consulting physician, but also conducted an independent review of the medical evidence.") Futher, substantial evidence supports the ALJ's conclusion that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible. In July 2009, plaintiff reported that she had not had alcohol since December 2008, but her blood alcohol level in February 2009 was above the legal driving limit. (Tr. 432). Plaintiff's untruthful statements regarding her alcohol use undercut her credibility and limited the functional limitations attributable to her allegations of subjective symptoms.

### 2. Plaintiff's Ability to Perform Other Jobs

Finally, plaintiff argues that the vocational expert's testimony is not substantial evidence because it was given in response to an improper hypothetical question. "Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007). "Therefore, the hypothetical question answered by a vocational expert must include all those impairments that are substantially supported by the record as a whole." Taylor v. Chater, 118 F.3d 1274, 1278-79 (8th Cir. 1997).

The plaintiff argues the hypothetical question was improper because it did not include the limitations of following only one- or two-step instructions and performing simple work-related tasks. In the mental RFC assessment, Dr. DeVore rated plaintiff to be moderately limited in the ability to understand and remember detailed instructions. (Tr. 371). In a separate examination, Dr. Rabun found plaintiff to have the capacity to focus, concentrate and remember instructions. (Tr. 452). Plaintiff was able to drive and do jigsaw puzzles. (Tr. 167, 357). She had a high school diploma and was taking online college courses. (Tr. 49, 17). In light of this evidence, it was appropriate to exclude the limitations plaintiff claims. Thus, there was no error in the hypothetical question and the vocational expert's testimony constituted substantial evidence.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #18] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 20th day of September, 2012.